b

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**TODD A LEWIS,**
**Plaintiff**

**CIVIL DOCKET NO. 2:24-CV-00437**

**VERSUS**

**JUDGE JAMES D. CAIN, JR.**

**MARTIN J O'MALLEY,**
**Defendants**

**MAGISTRATE JUDGE PEREZ-MONTES**

---

# REPORT AND RECOMMENDATION

Before the Court is an appeal by Todd A. Lewis ("Lewis") from the final decision of the Commissioner of Social Security (the "Commissioner") denying his Title II application for disability insurance benefits. ECF No. 1.

Because the administrative law judge ("ALJ") committed a harmful legal error, IT IS RECOMMENDED that Lewis's appeal (ECF No. 1) be GRANTED, the final decision of the Commissioner be VACATED, and the case be REMANDED for further proceedings consistent with this opinion.

## I. Background

### A. Procedural History

On November 18, 2020, Lewis filed an application for disability insurance benefits alleging a disability onset date of July 1, 2019. ECF No. 6-1 at 199–202. Lewis's claim was denied initially and upon reconsideration. *Id.* at 94–102, 106–14. Lewis requested a hearing. *Id.* at 115.

An ALJ convened a *de novo* hearing. *Id.* at 38–70. Lewis, Lewis's attorney, and a vocational expert ("VE") were present. *Id.* at 38. The ALJ found that Lewis was not under a disability as defined in the Social Security Act ("SSA") from the alleged disability onset date through November 17, 2023, the date of decision. *Id.* at 28. The Appeals Council declined Lewis's request for review, *see id.* at 6–8, and the ALJ's decision became the final decision of the Commissioner.

Lewis appealed the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1.

### B. Medical Records

The U.S. Department of Veterans Affairs ("VA") has found that Lewis has the following disabilities: degenerative arthritis, limited range of motion in his arm, limited flexion of his forearm, lumbosacral or cervical strain, tinnitus, hypertensive vascular disease, scars, and migraine headaches. ECF No. 6-1 at 415.

On February 22, 2019, Lewis completed a Disability Benefits Questionnaire issued by the VA. *Id.* at 395–97. Lewis complained that he had been suffering from headaches since he received "Anthrax shots" in 2007. *Id.* at 395. He reported that his headaches occurred about three times a week, and the pain typically lasted one to two days. *Id.* at 396. He also reported that his sinusitis occasionally caused frontal headaches. *Id.* Lewis received a CT scan of the head and a chest X-ray. *Id.* at 398, 410–11, 439–40. The CT scan indicated Lewis had sphenoid and ethmoid polypoid sinusitis but was otherwise normal. *Id.* at 398, 410, 439. The chest X-ray was normal. *Id.* at 411, 440. Lewis also received a plasma test, which was suggestive of Stage 1 chronic kidney disease. *Id.* at 447.

On April 11, 2019, Lewis met with Dr. Arnold Alper, M.D. ("Dr. Alper") at the VA. *Id.* at 388–90. Lewis complained that his short-term memory was "quite poor." *Id.* at 390. His immediate recall "of 3 words/objects [was] 0/3 at 5 minutes." *Id.*

On May 10, 2019, Lewis completed a Disability Benefits Questionnaire administered by Dr. Williams Schmitz, Jr., PsyD ("Dr. Schmitz"), a clinical psychologist at the VA. *Id.* at 369–88. Lewis was diagnosed with unspecified anxiety disorder manifesting as a "general sense of anxiety/tension, with concurrent sleep problems." *Id.* at 369–70 (emphasis removed). Lewis reported that he got approximately two to three hours of sleep and would wake up feeling more tired. *Id.* at 374. Lewis indicated he had been having anxiety attacks and military-related movies and books made him anxious. *Id.* at 377. He reportedly had not seen a mental health professional in several years because he did not "trust people." *Id.* Lewis additionally told Dr. Schmitz that he did not have hobbies or interests anymore because his shoulders and back prevented him from playing sports or swimming. *Id.* at 377. Lewis reported that he was injured while serving in the military after "a couple SPs . . . dumped [him] on [his] neck," purportedly causing four herniated discs and numbness in his arms and hands. *Id.* at 375.

Lewis scored a fifty-six on a DSM 5 (PCL-5) post-traumatic stress disorder ("PTSD") checklist, which fell above the score normally associated with PTSD. *Id.* at 382. His Beck Depression Inventory test indicated "moderate depressive symptoms,"

and his Personality Assessment Inventory indicated "moderate elevations that may reflect sources of difficulty for" Lewis. *Id.* at 382, 384. Dr. Schmitz found that Lewis's anxiety did not severely impact Lewis's daily functioning. *Id.* at 387.

On August 14, 2020, Lewis completed a drug screen at the VA. *Id.* at 399. He received an unconfirmed positive result for both cannabinoids and cocaine. *Id.* He also received a plasma test, which was suggestive of Stage 2 chronic kidney disease. *Id.* at 447.

On August 17, 2020, Lewis was contacted by the VA for a medication review. *Id.* at 367–69. Lewis complained of daily pain, a lump in his neck, a limited range of motion in his neck, loss of muscle mass and function in his right arm, anxiety, and sleeping problems. *Id.* at 367. Lewis requested an X-ray of his shoulder. *Id.*

On September 3, 2020, Lewis completed a Columbia Suicide Severity Rating Scale screener at the VA. *Id.* at 364–65. Lewis reported that he had not had suicidal thoughts in the past month and had not, in his lifetime, done anything to prepare to end his life. *Id.* During a case management screening that same day, Lewis indicated that he would like to schedule an appointment to treat his arm and shoulder pain. *Id.* at 366.

On April 6, 2021, Lewis received x-rays of his right hand, right shoulder, and cervical spine. *Id.* at 466. His hand and shoulder x-rays were normal. *Id.* His cervical spine x-ray showed a severe decrease in disc spacing from C3-C4, C4-C5, C5-C6, and C6-C7 with approximately 20-30% vertebral body height loss around C4, C5, and C6. *Id.* The cervical spine x-ray also showed anterior osteophyte formation on the

aforementioned vertebral bodies. *Id.* The x-ray was found to be indicative of severe multilevel degenerative disc disease and spondylosis of the cervical spine. *Id.*

### C. Administrative Hearing

At his administrative hearing, Lewis testified that he received an associate's degree in general studies. ECF No. 6-1 at 42. From 1991 to 2011, he served in the United States Air Force. *Id.* at 45. He worked as an aircraft mechanic from 2008 to 2011. *Id.* In 2017, Lewis moved to Louisiana and worked for several different companies as a security officer. *Id.* at 44. He reported that his work as a security officer required him to "work[] the gate," search vehicles and individuals, and conduct area checks. *Id.* In 2019, Lewis worked at Burger King. *Id.* at 43–43. He testified that he had not worked since July 2019 but had received disability payments and military retirement. *Id.*

Lewis reported that he lived alone. *Id.* at 46. During the day, he would do "a little bit" of cleaning and gardening. *Id.* He testified that he could drive but did not travel long distances. *Id.* He reported that he occasionally went to the casino and spent time with his family, but he did not frequently go out to eat. *Id.* at 46–47.

Lewis then discussed his alleged disabilities. *Id.* at 47. He reported that he had experienced paralysis in his right arm after losing "all muscle mass" for an unknown reason. *Id.* at 47–48. He testified that the paralysis kept him from "do[ing] anything" with his right arm. *Id.* at 47. He further claimed that he had not been able to work at Burger King because of the arm paralysis and believed he would not be able to return to his previous work as a security guard. *Id.* at 48–49, 58–59.

Lewis testified that his arm paralysis "created a pain" in his left hand because he had to use that hand often when caring for his mother. *Id.* at 59. He claimed that a doctor was evaluating his left hand and that he had gone to the VA clinic a month before the hearing to treat his arm. *Id.* at 60. He took pain medication but had not undergone any other specific treatments. *Id.* at 48–49.

Lewis testified that both his shoulders were "bad," but his right shoulder was his "worst one." *Id.* at 50. Lewis additionally reported receiving an upper neck injury after he was dropped on his neck while serving in the military. *Id.* at 47, 50. He claimed difficulty turning his neck and holding his head in one position. *Id.* at 51, 53. He also claimed that it was painful to lift his neck up and down. *Id.* at 51. He rated his neck pain as an eight out of ten but reported that pain medications could reduce his pain level to a five. *Id.* at 52–53. He testified that his pain interfered with his ability to concentrate. *Id.* at 53. He also reported that his neck pain caused daily headaches lasting approximately thirty to forty minutes. *Id.* at 56.

With respect to his arms and shoulders, Lewis testified that he had nerve pain in both arms and that his thumbs, pointer fingers, and middle fingers were "numb and tingling all the time." *Id.* at 53–54. He represented that he had difficulty reaching overhead, to the side, and in front of him. *Id.* at 54. He reported that it was difficult to put his arms in a shirt, reach and pull up his pants, put on his belt, and use buttons, zippers, and shoelaces. *Id.* He used his left hand to shave and bathe. *Id.*

Lewis then discussed his anxiety. *Id.* at 55. He reported that he got anxiety attacks twice a month that mimicked the symptoms of a heart attack. *Id.* at 55, 57.

He did not know what triggered the anxiety attacks but purportedly was anxious around other people. *Id.* at 55, 58. Lewis additionally testified to having intrusive thoughts and memories. *Id.* at 58. However, he claimed that the intrusive thoughts and memories began to occur less frequently after he started to "avoid certain things." *Id.* at 58. He testified that he avoided "[m]ilitary personnel . . . and the base" because it could trigger his PTSD. *Id.* at 58.

Lewis also testified that he had tinnitus. *Id.* at 56. He testified to experiencing ringing in his ears "a couple of times a month" for about ten to fifteen minutes each time. *Id.* at 57. He claimed he could only hear ringing when the tinnitus began, which made conversations with others difficult. *Id.*

Lewis testified he could walk a block or two before needing to stop, could only stand or sit for about twenty minutes before needing to shift positions, and could lift and carry about five pounds across a room. *Id.* at 55. He testified he could not pick coins off a table one at a time and instead would have to slide and scoop them into the other hand. *Id.* at 55–56. He testified that he dropped "anything that [he] tr[ied] [to] pick up" because he could not "hold it for long." *Id.* at 56. He reportedly could reach and grasp things with his left hand. *Id.*

During the VE's testimony, she classified Lewis's previous work as a security guard as light duty and his previous work as a supervisor in the avionics shop as medium duty. *Id.* at 61–63. The VE testified that neither occupation had transferable skills at the sedentary level. *Id.* at 64.

The ALJ then examined the VE. *Id.* at 63–66. The ALJ asked the VE to assume a hypothetical individual with the same age, education, and past relevant work as Lewis. *Id.* at 64. The ALJ then limited that individual to light work, only occasional postural activities, no climbing of ladders, ropes, or scaffolds, only occasional frequent overhead reaching, and frequent handling and fingering bilaterally. *Id.* at 64–65. The VE testified that this individual would be able to perform Lewis's past work as a security guard. *Id.* at 65.

The ALJ then further reduced the hypothetical individual's fingering and handling to only occasional. *Id.* The VE testified that this individual would not be able to perform any of Lewis's past work. *Id.* The VE further testified that this individual would not have transferable skills. *Id.* Finally, the VE testified that this individual would be able to work as an investigator of accounts, boat rental clerk, and sandwich board carrier. *Id.*

Lewis's attorney then examined the VE. *Id.* at 66–69. The VE testified that the aforementioned jobs would not tolerate being absent more than one day per month, taking more than the standard three fifteen-minute breaks, or engaging in off-task behavior for more than 10% of the workday on a sustained basis. *Id.* at 66. She further testified that if an individual needed to go off-task for more than 10% of the workday to sit, stand, and/or walk, he would not be able to find competitive work in the national economy. *Id.* at 67. Finally, she testified that if an individual could only occasionally hold their head in one position to look at a computer screen or to look down, he would not be able to work as an investigator of accounts. *Id.* at 67–68.

Lewis's attorney then modified the hypothetical to limit the individual to only occasional contact with coworkers and supervisors. *Id.* at 68. The VE testified that the individual could still work as an investigator of accounts, boat rental clerk, and sandwich board carrier. *Id.* Lewis's attorney then modified the hypothetical to additionally limit the individual to only occasional contact with the public. *Id.* at 69. The VE testified the individual would not be able to perform the selected jobs because "[t]hey all involved public contact." *Id.*

### D. ALJ's Findings and Conclusions

The SSA promulgated a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a). This process requires the ALJ to determine whether a claimant (1) is engaging in substantial gainful activity; (2) has a medically determinable severe impairment or a combination of impairments that is severe; (3) has an impairment or combination of impairments listed in or medically equivalent to those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) has the residual functional capacity to perform her past relevant work; and (5) has the residual functional capacity, age, education, and work experience to perform any other type of work. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)). To be entitled to benefits, an applicant bears the initial burden of showing he is disabled. Under the regulations, this means the claimant bears the burden of proof

on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found Lewis had not engaged in substantial gainful activity since his alleged disability onset date. ECF No. 6-1 at 22. At Step Two, the ALJ found that Lewis had the following severe impairment: degenerative disc disease. *Id.* But at Step Three, the ALJ determined that Lewis did not have an impairment or combination of impairments listed in or medically equivalent to one listed in Appendix 1. *Id.* at 24.

The ALJ then found that Lewis had the residual functional capacity to perform light work except he could only perform occasional stooping, kneeling, crouching, crawling, balancing, and climbing ramps and stairs; could never climb ladders, ropes, or scaffolds; and could engage in occasional bilateral overhead reaching and frequent handling and fingering. *Id.* At Step Four, the ALJ determined that Lewis had the residual functional capacity to return to his past work as a security guard. *Id.* at 27.

Accordingly, the ALJ concluded that Lewis had not been under a disability as defined in the SSA from his alleged disability onset date through November 17, 2023, the date of the ALJ's decision. *Id.* at 28.

## II. Law and Analysis

### A. Scope of Review

A court's review of Social Security disability claims is "exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's

decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Boone v. O'Malley*, No. 23-40401, 2023 WL 9018388, at *1 (5th Cir. Dec. 29, 2023) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).

"When substantial evidence supports the ALJ's findings, these findings 'shall be conclusive' and must be affirmed." *Daigle v. Kijakazi*, No. 22-30721, 2023 WL 4501865, at *1 (5th Cir. July 12, 2023) (citing 42 U.S.C. § 405(g)). For the evidence to be substantial, it must be "more than a scintilla and less than a preponderance," and "of such relevance that a reasonable mind would accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

"[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision. [The Court] must consider the record as a whole. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court reviewing the Commissioner's decision "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the fact finder." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle*, 2023 WL 4501865, at *1.

A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See *Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

Here, Lewis argues remand is required because the ALJ (1) did not adequately explain why the opinion of Dr. Tosheiba Holmes, M.D. ("Dr. Holmes") was only partially persuasive, (2) substituted his lay opinion for Dr. Holmes's opinion, (3) failed to explain why he did not include limitations from an opinion he found persuasive, and (4) failed to develop the evidence of record. *See generally* ECF No. 7.

**B. <u>The ALJ Erred When Evaluating Dr. Holmes's Opinion.</u>**

Dr. Holmes opined that Lewis had "limited ability to reach, handle[,] or grasp" and could only lift and carry less than five pounds "on an occasional basis on the right side." ECF No. 6-1 at 435. The ALJ found Dr. Holmes's opinion "partially persuasive," stating:

> The claimant attended a consultative examination on February 13, 2021 with Dr. Holmes. Dr. Holmes provided the following restrictions: limited ability to reach, handle or grasp, only lift and carry under 5 pounds occasionally on the right side, which is consistent with the testing performed at the examination. [] The undersigned finds this opinion partially persuasive. Dr. Holmes' opinions are supported by clinical findings. The claimant stated that he had difficulty lifting more than 5-10 pounds with both arms. [] He said that he had difficulty standing for 30-60 minutes, and can only drive a car for no more than an hour at a time. [] He estimated that he could walk a mile on level ground and stand 30-60 minutes [] However, testing revealed that claimant's right grip strength was 4-/5 and his left grip strength was 4/5, with difficulty picking up coin on right at 6/10 and difficulty picking up a coin on the

> left at 8/10. Dr. Holmes measured the claimant's right arm weakness at 3/5, and his left at 4-/5[.] [] His right arm had atrophy on the right shoulder girdle and bicep []. The claimant also had decreased cervical spine and shoulder range of motion with, limited ability to reach, handle and grasp []. The claimant's gait was normal, and he was able to toe/heel walk and squat; he could not bend over and touch his toes. [] The undersigned is persuaded by Dr. Holmes' opinion on the claimant's ability to reach, handle, or grasp, however Dr. Holmes' opinion about claimant's ability to lift and carry is not consistent with the testing performed.
>
> . . .
>
> Dr. Holmes performed x-rays, on April 6, 2021 at the request of DDS. X-rays of the claimant's right hand and shoulder were normal []. The X-rays of his cervical spine showed severe multilevel degenerative disc disease and spondylosis. [] As the right upper extremity x-rays were normal, but the cervical spine x-ray revealed abnormal findings, it is reasonable to conclude that the claimant's right arm limitations originate from the cervical degenerative disc disease.

ECF No. 6-1 at 25–26.

Lewis assigns two errors to this analysis. First, Lewis argues the ALJ "did not describe any of the treatment records, exams, objective testing, or other opinion evidence that allegedly contradicted" Dr. Holmes's opinion. ECF No. 7 at 3. Second, Lewis urges that the ALJ "independently speculated" that Lewis's right arm limitations originated from his cervical degenerative disc disease and thus rejected Dr. Holmes's "based on his unfounded interpretation of raw medical findings." *Id.* at 4. Ultimately, the Court agrees the ALJ erred when evaluating Dr. Holmes's opinion.

For claims filed on or after March 27, 2017, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. *Jones v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-01055, 2022 WL 3509035, at *7 (W.D. La. 2022), *report and*

*recommendation adopted*, 2022 WL 3448676 (W.D. La. 2022) (citing 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 416.920c(a)).

Under the new regulations, rather than assigning weight to the medical opinions, the Commissioner must articulate "how persuasive" he finds the medical opinions. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 416.920c(b)). And the Commissioner's consideration of the persuasiveness of medical opinions is guided by the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); (4) specialization of the medical source; and (5) any other factors that tend to support or contradict the opinion. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(c)(1)–(5); 20 C.F.R. § 416.920c(c)(1)–(5)).

"Supportability" and "consistency" are the most important factors. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2)). The ALJ must explain these two factors, but he need not expound on the remaining three unless he finds that two or more non-identical medical opinions are equally well-supported and consistent with the record. *See Jones*, 2022 WL 3509035, at *7 n. 5 (citing § 416.920c(b)(2)–(3)). The fact that a medical source examined the claimant or specializes in an area germane to the claimant's medical issues is not a primary or dispositive consideration in assessing the medical opinion.

*See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(c); 20 C.F.R. § 416.920c(c)).

The regulations direct an ALJ to consider a medical opinion's persuasiveness based on how much the objective medical evidence and the medical source's explanation support the medical opinion and how consistent the medical opinion is with the evidence from other sources. *See Harris v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-00910, 2022 WL 421121, at *9 (W.D. La. 2022) (citing 20 C.F.R. § 416.920c(c)).

"Supportability" looks to "the objective medical evidence and supporting explanations presented by a medical source [] to support his . . . medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). "Consistency" looks to how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2).

Here, the ALJ did not explain how or whether Dr. Holmes's opinion was consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). And the ALJ's supportability analysis is, at best, inexplicably inconsistent. That is, the ALJ states that Dr. Holmes's opined lifting and carrying restriction is both consistent and inconsistent "with the testing performed at the examination." *Compare* ECF No. 6-1 at 25 ("Dr. Holmes provided the following restrictions: . . . only lift and carry under 5 pounds occasionally on the right side, which is consistent with the testing performed ") *with id.* at 26 ("Dr. Holmes' opinion about claimant's ability to lift and carry is not consistent with the

testing performed."). Thus, the ALJ improperly failed to address both the supportability and consistency factors adequately.

Even accepting that the ALJ found the testing inconsistent with the opined limitation, the ALJ failed to adequately explain the basis for that finding. Certainly, "an 'ALJ is not always required to do an exhaustive point-by-point discussion' of the evidence []he reviews." *Silva v. Kijakazi*, No. 22-51045, 2023 WL 3723628, at *1 (5th Cir. May 30, 2023) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)). But the ALJ's explanation "must 'enable[] the court to undertake a meaningful review of whether his finding about the particular medical opinion was supported by substantial evidence' and must not 'require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof.'" *Probst v. Kijakazi*, No. 22-CV-00286, 2023 WL 3237435, at *4 (W.D. Tex. May 3, 2023) (alteration original) (quoting *Cooley v. Comm'r of Soc. Sec.*, 587 F. Supp. 3d 489, 499 (S.D. Miss. 2021)). Courts in this circuit have found that this standard requires "a discernible logic bridge between the evidence and the ALJ's persuasiveness finding." *Collar v. Comm'r of Soc. Sec.*, No. 22-CV-1026, 2024 WL 737306, at *6 (M.D. La. Jan. 22, 2024) (quotations omitted), *report and recommendation adopted*, No. 22-CV-1026, 2024 WL 735375 (M.D. La. Feb. 22, 2024).

The Court cannot draw the requisite logic bridge here. The ALJ's vague reference to "the testing performed," ECF No. 6-1 at 26, prevents the Court from meaningfully determining whether that finding is supported by substantial evidence. As it stands, the Court would be forced to speculate as to why the ALJ found only

some aspects of the testing inconsistent with Dr. Holmes's opinion. The Court will not do so.

Because the ALJ did not adequately explain why he found Dr. Holmes's opined lifting and carrying limitation unpersuasive, the ALJ erred.

C. The ALJ's Error Was Not Harmless.

"Procedural perfection in administrative proceedings is not required. Th[e] court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error." *Wilder v. Colvin*, No. 13-CV-3014, 2014 WL 2931884, at *5 (N.D. Tex. June 30, 2014).

Here, the ALJ's errors were prejudicial. At Step Four, the ALJ found Lewis was not disabled because he could return to his past relevant work as a security guard, which was classified as a light exertion job. ECF No. 6-1 at 27. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). As indicated above, Dr. Holmes found that Lewis could only lift and carry less than five pounds "on an occasional basis on the right side." ECF No. 6-1 at 435. A proper evaluation of that opinion could lead to a more limited residual functional capacity determination inconsistent with light work. If the opined limitations were to be included, a different result could be reached. Therefore, this error is not harmless.

Lewis's case should be remanded for a proper evaluation of Dr. Holmes's opinion, including his opinion that Lewis could only occasionally lift and carry less than five pounds on the right side. Because this error alone is dispositive and warrants remand, the Court does not consider any other allegations of error.

## III. Conclusion

Because the ALJ committed a harmful legal error, IT IS RECOMMENDED that Lewis's appeal (ECF No. 1) be GRANTED, the final decision of the Commissioner be VACATED, and the case be REMANDED for further proceedings consistent with this opinion.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Tuesday, August 4, 2026.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE